Filed 11/3/15  P. v. Lynch CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B259015 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.GA091615) |
| v. | |
| RYAN PATRICK LYNCH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Donald G. Umhofer, Judge.  Affirmed.

Karen Hunter Bird, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Ryan Patrick Lynch of one count of first degree burglary in connection with a home invasion that took place on or around November 25, 2013. (Pen. Code § 459.)[1] At a subsequent bench trial, the court found true allegations that defendant was convicted of first degree burglary, a strike offense (§§ 667, subd. (d); 1170.12, subd. (b)); in 2005, suffered a serious felony conviction within the meaning of section 667, subdivision (a)(1); and suffered a prison prior within the meaning of section 667.5, subdivision (b). The court declined to strike defendant's prior burglary conviction pursuant to section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*) and ultimately sentenced him to a total of 13 years in state prison. Defendant contends that the court abused its discretion by declining to strike his prior burglary conviction and by sentencing him to 13 years in prison. We disagree and affirm.

## PROCEDURAL BACKGROUND

Defendant was charged with one count of first degree burglary. (§ 459.) The information also alleged that defendant had been convicted of another burglary eight years earlier in 2005, and that the conviction was a serious felony (§§ 667, subds. (a) & (d); 1170.12) subjecting him to sentencing pursuant to sections 667, subdivisions (b) through (j), and 1170.12. It further alleged that defendant suffered a second prior burglary conviction for which he served a prison term and committed another felony within five years of the conclusion of that prison term (§ 667.5, subd. (b).)

Prior to trial, defendant filed a *Romero* motion asking the court to strike his prior strike offense, the 2005 burglary conviction. The court denied the motion "given the recency of the prior burglary conviction" and because defendant was not "an appropriate candidate" for relief under *Romero*. A second trial judge declined to "re-hear and re-rule on the *Romero* motion," and defendant proceeded to a jury trial.

A jury found defendant guilty of one count of first degree burglary. The court subsequently found true the prosecution's allegations that defendant suffered a prior strike conviction for first degree burglary, that the offense was a serious felony within the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

meaning of section 667, subdivision (a)(1), and that defendant was convicted of a felony within five years of being released from custody for another burglary conviction. The court denied defendant's request for probation (a sentence that would be legally possible only if his *Romero* motion were granted), but struck the one-year punishment for the prison prior. The court ultimately sentenced defendant to a total of 13 years in state prison, the midterm of four years for the burglary, doubled pursuant to sections 667, subdivisions (b)-(j) and 1170.12, subdivisions (a)-(d), plus a consecutive five years pursuant to section 667, subdivision (a)(1). The court awarded defendant presentence custody credit of 550 days, consisting of 275 days of actual custody and 275 days of conduct credit.

Defendant timely appealed.

## FACTUAL BACKGROUND

### A. *Prosecution Evidence*

At 5:30 a.m. on November 25, 2013, Deputy Ricardo Osorio of the Los Angeles County Sheriff's Department responded to an alarm call at a residence in an unincorporated area of Pasadena. The house had been occupied by Harold Fraser until his death in May 2013, after which it passed to a trust administered by his sons Steven and Jeffrey. Both sons visited and stayed at the house intermittently for two to three days at a time. They used funds in the trust to pay for a gardener and an alarm system. They also paid a woman named Navidad or Natividad and her daughter, Gloria, to clean the home while Harold was alive, but terminated their employment a few weeks after his death. Steven and Jeffrey did not give anyone permission to enter or remove anything from the house.

Upon arriving at the house, Osorio noticed that the front gate of the well-maintained yard was open. As he circled the house with his partner, he observed an open sliding glass door leading to a covered patio. The doors leading from the patio into the house were secure and did not show signs of forced entry. However, Osorio also saw a chair leaned up against the northwest wall of the house, below an open window from

3

which the screen had been removed. The chair, which belonged to a set of chairs in the covered, enclosed patio, had two footprints on it. Osorio called for backup.

Deputy Michael Fugawa was among the deputies who responded to Osorio's call. Fugawa noticed a screwdriver lying on the ground near the chair beneath the window. He also noticed a muddy footprint on the chair facing into the residence. One of the other responding deputies retrieved a ladder from somewhere on the property, and Fugawa climbed up the ladder to look in the window. There was a set of muddy footprints in the house. Fugawa climbed through the window and let two additional deputies, Wood and Klinski, into the house through one of the doors leading to the enclosed patio.

Once inside, the three deputies announced their presence by yelling, "Sheriff's Department. If anybody is in there, come out." No one came out. The three deputies searched the house as a "stacked team." During the search, Fugawa noticed a clean spot on the wall of one of the bedrooms, where a picture or frame had been. He also noticed that the drawers in another bedroom were open.

Fugawa opened the closet in a third bedroom and discovered defendant sitting inside. Defendant was seated in a fetal position with his arms around his knees and his head down. He was partially concealed by some hanging clothes and had clothes on top of him as well. He was wearing a pair of dirty black gloves with worn off fingertips and had a fake beard and mustache around the back of his neck. He was holding a flashlight in his right hand. The bottoms of his shoes were muddy.

Fugawa performed a pat-down search of defendant. He found in defendant's left pocket two watches, a magnifying glass, and a brass belt buckle emblazoned with a fisherman. Fugawa retrieved a garage door opener for the house's garage from defendant's right pocket. The deputies also found two plastic bags filled with "knick knacks" and jewelry, a stack of paintings, and a suitcase full of jewelry boxes in the immediate area of defendant's closet hiding place. The jewelry in the bags belonged to Steven and Jeffrey Fraser's late mother, who passed away in 2003. The watches, magnifying glass, and belt buckle belonged to the late Harold Fraser. The garage door

4

opener had been on the table in the enclosed patio; Steven had left it there for the gardener.

While Fugawa, Wood, and Klinski were searching the house and apprehending defendant, another responding deputy, Kyle Otis, monitored the exterior of the house. Otis left the property at the end of his shift and saw a black Ford Explorer parked on the street near the property. Otis thought the Explorer "looked out of place" because it was the only car parked on the street and was parked between two properties. Otis ran the license plate on the Explorer and learned it was registered to a Los Angeles resident by the name of Alhem Louis. Otis looked inside the Explorer, the doors of which were unlocked. He saw the keys lying on the center console and miscellaneous tools on the front passenger seat. Otis believed the vehicle "was staged, like a get-away vehicle." Defendant later told Fugawa that the Explorer was his.

### B.    Defense Evidence

Defendant testified on his own behalf as his sole witness. He testified that on November 23, 2013, defendant called his friend Rose at 2:30 a.m. Rose told defendant she worked for a man who was deceased, and that defendant could spend the night in the deceased man's garage. Defendant drove to the house, where his car died. He put on some gloves to try to fix the car and kept them on because it was cold. Defendant left his keys and cell phone in the car. He also left a bag of tools under the front seat.

Defendant walked over to the house and found the garage door opener lying on the table in the enclosed patio. He went into the garage and lay down for awhile before calling Rose. At some point, while walking back to his car, defendant noticed that there was an open window on the side of the house. He told Rose, who gave him permission to enter the house and close the window. Defendant entered the house through an unlocked door off the patio. It was already daylight when he entered the house.

Defendant tried to close the window but was unable to do so because the latch was jammed. While he was walking through the house, an audible alarm began to sound. Defendant stayed in the house. At some point after the alarm stopped ringing, defendant heard people knocking. Defendant became startled because he thought people were

5

breaking into the house. He picked up a gold watch from the table on the patio, put it in his pocket, and hid in the closet. He did not pick up a second watch, a belt buckle, or a magnifying glass.

Defendant went all the way into the closet "where the clothes were on top of [him]" and closed the door. He did not have a flashlight with him and was not wearing a fake mustache or beard. The bags and suitcase the prosecution showed to the jury were located in other bedrooms, not the one in which defendant was hiding. Defendant did not intend to steal anything from the home.

Defendant admitted that he suffered three felony convictions involving theft in 2005.

## DISCUSSION

Defendant contends that the trial court abused its discretion by denying his *Romero* motions to strike his prior conviction. Although defendant argued for a sentence of probation below, he currently "is not arguing that the failure of the trial court to grant probation was an abuse of discretion, [but instead] he is asking this court to find that the trial court abused its discretion by sentencing him to 13 years given the totality of the circumstances."

## I.      Applicable Law

Section 1385, subdivision (a), permits a trial court to dismiss a criminal action "in furtherance of justice." This power to dismiss an action "includes the lesser power to strike factual allegations relevant to sentencing, such as the allegation that a defendant has prior felony convictions." (*Romero*, *supra*, 13 Cal.4th at p. 504.) In *Romero*, the Supreme Court held that section 1385, subdivision (a), is applicable to cases brought under the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12). (*Romero*, *supra*, at pp. 504, 529-530.)

In ruling on a defendant's *Romero* motion, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the . . . spirit [of the Three Strikes law],

6

in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).) Because the Three Strikes law "establishes a sentencing norm" and "carefully circumscribes the trial court's power to depart from this norm [by] requir[ing] the court to explicitly justify its decision to do so," "the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*People v. Carmony* (2004) 33 Cal.4th 367, 378 (*Carmony*).) "In light of this presumption, a trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances." (*Ibid.*) "'[W]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance.'" (*Ibid.*, quoting *People v. Myers* (1999) 69 Cal.App.4th 305, 310.) We overturn the court's ruling only if it falls outside the bounds of reason under the applicable law and relevant facts. (*Williams*, *supra*, 17 Cal.4th at p. 162.)

The party attacking the sentence bears the burden of clearly showing the sentencing decision was arbitrary or irrational. (*Carmony*, *supra*, 33 Cal.4th at p. 376.) We presume the court considered all the relevant factors in the absence of an affirmative record to the contrary. (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.)

## II.   Relevant Proceedings

Prior to trial, defendant filed a *Romero* motion asking the court to strike his prior strike offense, the 2005 burglary conviction. In his supporting memorandum, defendant argued that neither the instant charge nor his previous convictions involved violence. He also noted his traumatic childhood, which included watching his parents die, living in an orphanage before being adopted, suffering physical abuse, and relocating to the United States from his home country of Brazil. Defendant further argued that he had a history of mental illness and learning disabilities. In its opposition, the prosecution emphasized the relative recency of defendant's prior burglary conviction, his lengthy criminal history, and the premeditated nature of the current burglary with which he was charged. The

court denied defendant's *Romero* motion, noting "the recency of the prior burglary conviction" and because defendant was not "an appropriate candidate" for relief under *Romero*.

Defendant reasserted his *Romero* request just prior to trial before a different judge. He sent the court a letter in which he claimed that his criminal history was driven by an untreated substance abuse problem and asked the court to "take a chance" on him by sentencing him to a drug treatment program rather than prison. His counsel also argued for the first time that defendant had won an award from his previous employer and would qualify for admission to drug court if his prior strike were stricken. The court declined to "re-hear and re-rule on the *Romero* motion," noting that the motion already had been addressed on the merits and that defendant had not provided the court with a good reason to revisit the recent decision of its colleague. The court invited defendant to present the issue again at his sentencing if he were convicted.

At sentencing, defendant asked the court to sentence him to probation and a residential drug treatment program, a sentence that would be possible only if the court struck defendant's prior strike. Defendant's counsel emphasized his traumatic childhood, mental illness, drug problems, and successful participation in the "MERIT" and "IMPACT" life skills programs offered by the jail. Defendant personally addressed the court to express remorse for his actions and admit his addiction problems, and his adoptive father asked the court to consider defendant's upbringing, diagnoses, and recent efforts to "develop[ ] more of a consciousness especially in the area of property."

The court again denied defendant's *Romero* request. The court acknowledged defendant's emotional problems and attention deficit hyperactivity disorder, but noted that defendant's family was very supportive and afforded defendant opportunities to address these issues "and he still can't apparently seem to get a handle on it." The court stated that it was "impressed" with the efforts defendant made in jail by participating in the rehabilitation programs, but concluded "it is not enough in my view to get beyond the fact that you have a debt to pay to society for being a crook." The court further opined that defendant's claim of drug addiction "seems to be overblown," because although he

8

had a conviction for possession of marijuana, "it is not like he is getting picked up for possessing heavy drugs. And I just don't have the impression of any evidence in this case he was under the influence of anything." (*Sic*.) The court also noted that it "can't get beyond the fact that Mr. Lynch, is not an honest person." The court cited defendant's "absurd" and "pretty strained" trial testimony, which was given "in the midst of his so-called rehabilitation, his certificates and programs trying to provide him some insight."

The court also considered the nature of defendant's offense. It concluded that "there is nothing particularly mitigating about how this offense took place. It was just a classic residential burglary." The court noted that defendant conducted the offense in a "somewhat sophisticated" manner by wearing gloves and a disguise and parking his car where he did. The court also noted that defendant chose to steal by entering homes rather than by shoplifting.

After deciding "for those reasons" not to strike defendant's prior conviction, the court stated that "the law is that I have to sentence [defendant] to state prison." The court further stated that its "hands are pretty tied" after making the decision not to strike the strike. It recognized that it "could make some findings with respect to mitigation in terms of choosing the lower term," but did "not find any mitigating factors with respect to [defendant's] behavioral or personality or mental health issues are outweighed by the offense, past offenses that you committed." The court reiterated that the current burglary evinced sophistication, and further noted that defendant committed offenses after being released from custody in the past and did not have good conduct while on probation. The court accordingly concluded that it "ha[d] to choose the middle term" of four years and "ha[d] to double it" because of defendant's prior strike conviction. The court added an additional five year consecutive term pursuant to section 667, subdivision (a)(1), resulting in a total sentence of 13 years in state prison.

III.   Analysis

Defendant argues that a sentence of 13 years in state prison "is simply too harsh" in light of his criminal history, the facts underlying the instant offense, and "the mitigation of [defendant's] mental issues brought on by a traumatic childhood." He

9

further contends the trial court should have considered "striking the strike just to keep from doubling the base term." We find no abuse of the court's broad discretion.

The court considered the proper factors each time it ruled upon defendant's motion. The court noted the "sophisticated" nature of the current offense and defendant's relatively recent prior convictions for similar theft offenses. The court also weighed defendant's childhood struggles, alleged substance abuse, and efforts to rehabilitate himself before concluding that his case was not one of the "extraordinary" ones (*Carmony*, *supra*, 33 Cal.4th at p. 376) that should "be deemed outside the . . . spirit [of the Three Strikes law], in whole or in part" (*Williams*, *supra*, 17 Cal.4th at p. 161). Defendant suggests that the court should have given more weight to the relatively young age (24) at which he committed his prior strike offense, the low term sentence he received for that offense, the non-violent nature of his only other felony conviction, and the "severe mental and psychological damage" he suffered during his childhood in Brazil. Defendant in essence asks this court to substitute our judgment for that of the trial court. Even if we were permitted to do so, which we are not (see *Carmony*, *supra*, 33 Cal.4th at 379-380), defendant has not carried his burden of demonstrating that the court's weighing of the relevant factors was arbitrary or irrational (*id.* at p. 376). We find no abuse of discretion in the court's refusal to strike his prior strike offense.

We likewise find no abuse of discretion in the court's decision to impose a 13-year sentence rather than the nine years that the prosecution offered before trial. Defendant did not ask the court to consider such a sentence. In his sentencing memorandum and at the sentencing hearing, defendant exclusively requested and argued in support of a sentence of probation. He now contends that the court abused its discretion by neglecting to expressly consider a sentencing option neither party advocated, a proposition he appears to support only with a citation to the court's comments that its "hands are pretty tied" after denying a *Romero* motion and that it "ha[d] to choose the middle term" and "ha[d] to double it because of your prior."

Defendant overreads the court's comments. Although an abuse of discretion may occur where the court misunderstands the scope of its discretion or fails to exercise it

10

(*Romero*, *supra*, 13 Cal.4th at p. 530, fn. 13), the court's comments demonstrate no such misapprehension when viewed in context. The court correctly indicated that once it declined to strike defendant's prior strike, it was statutorily obligated to double the base term it imposed. (See § 1170.12, subds. (c)(1), (d)(1).) The court also stated that it felt it "ha[d] to choose the middle term" because, after considering the particular facts of defendant's case and his personal characteristics, it did "not find any mitigating factors" warranting imposition of a low term sentence. Moreover, it did so only after explicitly acknowledging its discretion to impose a low term sentence – "I do have, obviously, I could make some findings with respect to mitigation in terms of choosing the lower term." Taken as a whole, the record demonstrates that the court was fully aware of its sentencing options and appropriately exercised its discretion in selecting the sentence it did.

Defendant also seems to challenge the court's decision not to expressly consider "striking the prior and just imposing the base term (not doubled) plus five years for the prior." We are not aware of any authority supporting defendant's implicit argument that a court abuses its discretion when it does not expressly consider every possible sentencing permutation available. A trial court need not provide a full recitation of every sentence it may have considered and rejected before imposing the sentence it in fact selects. The general rule is that we presume the trial court acted to achieve legitimate sentencing objectives (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978), and defendant has not presented us with any reason to abandon that presumption here. We accordingly decline defendant's invitation to remand this matter "for further consideration of other sentencing options."

11

**DISPOSITION**

The judgment of the trial court is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

12